# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

LASCELLES RATTRAY,

                Plaintiff,

                                      **Case No. 07-C-916**

    **-vs-**

LIPPMANN-MILWAUKEE, INC.,

                Defendant.

---

# DECISION AND ORDER

---

The plaintiff, Lascelles Rattray ("Rattray"), is a black man of Jamaican descent. He worked as a welder at Lippmann-Milwaukee, Inc. ("Lippmann") starting in 2002 until he was terminated in 2007. Rattray claims that he was demoted during the course of his employment on account of his race in violation of Title VII. He also brings claims for hostile work environment and retaliation under 42 U.S.C. § 1981. Lippmann moves for summary judgment on all three claims. For the reasons that follow, this motion is granted.

## PRELIMINARY MOTIONS

### I.    Motion to Strike

Lippmann moves to strike portions of affidavits submitted by Rattray in opposition to its motion for summary judgment. Lippmann moves to exclude several paragraphs in multiple affidavits because they are not founded on personal knowledge, are conclusory and speculative, or constitute hearsay. *See* Fed. R. Civ. P. 56(e)(1). "Discrimination law would be unmanageable if disgruntled employees – the friends of the plaintiff and often people in

the same legal position as the plaintiff – could defeat summary judgment by affidavits speculating about the defendant's motives." *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).[1]

Lippmann also argues that many of Rattray's averments should be disregarded because they contradict prior deposition testimony. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998) ("where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken").[2]

In many respects, the Court finds that this motion is meritorious and should be granted. Instead of considering each objection individually (there are 109 objections in total), the Court merely disregarded any objectionable proposed findings of fact. Even if considered, the objectionable evidence would not defeat this motion for summary judgment.

## II.     Summary judgment procedure

Rattray failed to respond to Lippmann's proposed findings of fact, which is required by the local rules of this judicial district. *See* Civil L.R. 56.2(b)(1). The consequence is that the Court "must conclude that there is no genuine material issue as to any proposed finding

---

[1] For example, Mr. Riva states in his affidavit that "Lippmann did not demote Lascelles Rattray simply because of his attendance, because if that were the case, then I would have also been demoted for my attendance, especially since I got a 3-day suspension. Instead of being demoted for my attendance, I was later promoted." Defendant's Motion to Strike, D. 83, ¶ 86. *See also* D. 83, ¶ 99 (referencing affidavit of Mr. Allen who stated that "When Larry Pincolic got promoted in October 2005, I believed that I was more qualified than Larry Pincolic. I was more qualified than Larry Pincolic because I helped train him, I had a good attendance record, worked at the company longer than Larry Pincolic, had more work experience, and had formal education in welding").

[2] For example, Rattray stated in his affidavit that the "reviews that I wrote for Larry Pincolic in 2004 and 2005 stated that Pincolic had attendance problems and still needed to work on improving his welding skills." This contradicts his earlier deposition testimony that Pincolic was one of the best welders in his department. D. 83, ¶ 18.

-2-

of fact to which no response is set out." Civil L.R. 56.2(e). Rattray's attorney claims that he misinterpreted the rule, and requests leave to "more clearly delineate these material facts in dispute so as to fully comply instead of relying upon what I have previously filed." (D. 90). Granting this request would force Lippmann to request leave to file another reply. This would be unnecessarily burdensome and would only cause further delay at this late stage in the proceedings. The Court is entitled to expect strict compliance with its local rules regarding summary judgment motion practice, especially in a case that does not involve a *pro se* litigant. *See Cichon v. Exelon Generation Company LLC*, 401 F.3d 803, 809 (7th Cir. 2005).[3]

## BACKGROUND

Lippmann is a Wisconsin corporation located at 3371 E. Van Norman Avenue, Cudahy, Wisconsin. Lippmann is a manufacturer of jaw crushers and impact crushers as well as two-stage jaw/impact crushing and screening systems. The crushers manufactured by Lippmann are used in the recycling, quarrying, sand and gravel, mining and construction industries. The products manufactured by Lippmann have the capacity to crush stone and other products.

Lippmann is one of the leading companies that manufacture crushing machinery for the aggregate and recycling industries. Lippmann has been successful in attracting orders for this crushing equipment by producing a quality product by the deadline set by the

---

[3] Rattray's attorney indicates that he is "taking the initiative to fully comply" instead of "waiting for the court to make a ruling that I need to comply with the local rule." (D. 90). This additional filing was not forthcoming. Even if Rattray filed it, the Court would disregard it.

customer. It is important for Lippmann to manufacture the product by the deadline set by the customer so each order is manufactured on a timely basis.

## I. Initial employment

Rattray was hired by Lippmann in June of 2002. Before being hired by Lippmann, Rattray gained about 17 years of welding experience. Rattray also earned a certificate in Welding Technology from Airco Technical Institute. When Mr. Rattray was hired, Lippmann had in place a policy prohibiting discrimination based on prohibited characteristics that include, among others, race. As part of Lippmann's employee handbook, the Company maintained an Open Communications policy that included a problem-solving procedure to address concerns or problems which include channels for resolving problems or concerns and steps employees can take to resolve concerns and/or problems. Lippmann's employee handbook policies are provided to each employee and are disseminated company-wide.

Rattray's initial responsibilities as a welder were welding crushers, a piece of equipment used to crush stone. When he began his employment, he signed an orientation checklist with his initials. Lippmann also provided Rattray with an employee handbook.

Mr. Rattray was earning $13.50 per hour when he started employment at Lippmann. Over the course of Mr. Rattray's employment, he received ten pay raises, bringing his pay rate from $13.50 per hour to $20.74 per hour which was the rate of pay he was earning in January of 2008. The pay raises that Rattray received were authorized by Jeffrey Wagner, Lippmann's plant manager and Rattray's supervisor.

-4-

## II. Promotion

On or about June 1, 2004, Mr. Wagner and Robert Turner, President of Lippman, made the decision to promote Rattray to welding foreman. Because Wagner did not have personal welding experience, he created the position of welding foreman to have a knowledgeable welder oversee important functions in the Lippmann shop. The welding foreman position was created to assign, oversee and monitor the specific welding jobs that are performed within Lippmann to assure productivity and quality. Rattray received an increase in pay to $19.25 when he accepted the welding foreman position. A working welding foreman performs work during a percentage of the day as opposed to a working foreman who just directs and does not physically work.

When Rattray was the welding foreman, he was the only welding foreman. As welding foreman, Mr. Rattray was in charge of doing all the scheduling for all of the welders on all three shifts. When Rattray was welding foreman, he was the only one that was scheduling the welding department and that scheduling was his responsibility. He was authorized by Mr. Wagner and Mr. Turner to hire and fire welders. He also worked side by side with his fellow welders. Rattray could not perform his duties as welding foreman if he was absent from work. Rattray was solely responsible for assigning the welders particular tasks at the beginning of their shift. If welders were not assigned their tasks at the beginning of their shift, they could not begin their assignments. The scheduling of assignments for the welders was based on a report Rattray received from Wagner about what jobs were priorities.

Based upon that report, Rattray would schedule what tasks needed to be performed on each shift to get the job done.

When Mr. Rattray took over the welding department, he revolutionized it so "it became the best in the damn company." Rattray described himself as the "capable captain of the ship of the welding department." At Lippmann, Rattray believed he was "the best in what I do" and that this is why he was given pay raises. Over the course of his employment at Lippmann, Rattray worked 58-hour weeks on average and increased the quality and productivity of the welding department. His performance reviews from 2002-2005 stated that he was reliable, a good leader, was well-qualified as a welder, trained several employees well, and frequently worked overtime.

In all his time working at Lippmann, Rattray was never given his own set of keys to open the shop. When he was working first shift, keys were not necessary to enter the shop to start work. Wagner would not give out keys simply because an employee requested keys to the building. Rattray was not required to open the building at any time during his employ at Lippmann. As welding foreman, there were times when Rattray borrowed keys to let employees into the building on the weekend. There were other times when Rattray could not open the building because he did not have keys and Rattray had to send his men home. Wagner made the ultimate decisions as to who within the manufacturing department would receive keys to the building.

Rattray interviewed Larry Pincolic, a white man, when he applied to Lippmann for a job as a welder in May 2004. Although Pincolic had no formal welding schooling, very

little welding experience, and had a felony record, Rattray urged Lippmann to "take a chance" on Pincolic. After Rattray began to train Pincolic, he observed that Pincolic had hardly any experience. However, Rattray believed that Pincolic was one of the best welders in the department.

### III. Demotion

Rattray was aware of Lippmann's no-fault attendance policy, although he was not in charge of administering it. If an employee missed three days, the employee would get a write-up. If an employee then missed six days, the employee would get a verbal warning. If an employee missed eight days, the employee would get a three day lay off. Rattray was not responsible for administering Lippmann's attendance policy.

On May 24, 2005, Rattray received a disciplinary action for violating Lippmann's attendance policy by having three occurrences. On July 27, 2005, Rattray received another disciplinary action report for violating Lippmann's attendance policy which he signed, indicating he had further violations of the attendance policy by accumulating six occurrences. During the meeting with Mr. Wagner when Rattray received the July 27 written warning, Rattray indicated that he was having family problems, referring to a woman having an affair on him.

On August 31, 2005, Rattray received another disciplinary action report for violating Lippmann's attendance policy which he signed, indicating that he had eight occurrences under Lippmann's attendance policy. Due to his violating Lippmann's attendance policy by accumulating eight occurrences, Mr. Rattray was suspended for three days. Rattray

understood that any further violation of Lippmann's attendance policy would result in his termination from employment. Rattray does not contest that he was absent on the days for which he was disciplined.

When Rattray was unpredictably absent during the time he was welding foreman and was violating the attendance policy in 2005, there was a disruption to the overall operations within the welding department. There was not another individual that had centralized control over the welding assignments on the three shifts necessary to coordinate and process orders through the shop. In October of 2005, Wagner and Turner made the decision to demote Rattray.

When Rattray was demoted, Wagner told him that his attendance was not like it was in the past. Wagner told Rattray to turn over his things for the welding department and give them to Mr. Pincolic. Rattray told Wagner that Mr. Pincolic "ain't even qualified" and indicated that "this must be racial." Wagner asked Rattray why it "must be racial," and Rattray stated that "Wade Allen had a better attendance than Mr. Pincolic and he had schooling experience." Rattray identifies several white employees with worse attendance records who were promoted. None of those individuals were promoted to the welding foreman position. Because of the demotion, Rattray's job responsibilities decreased and he had a dollar reduction in his hourly pay.

Mr. Turner believed that based on attendance, Pincolic was more qualified than Rattray as a working welding foreman at the time of the demotion. Mr. Turner had Mr. Pincolic in mind to take the position of working welding foreman because Mr. Pincolic was

-8-

acting in that responsibility in Mr. Rattray's absences. Mr. Pincolic was performing all of the responsibilities of the welding foreman, including making out the schedule for the welders, and he was doing a good job. Mr. Pincolic took it upon himself to be in charge and other welders followed his instructions in Mr. Rattray's absence. Documentation shows that Pincolic had 7 2/3 attendance occurrences in 2005, but Pincolic was never suspended due to attendance.

In October 2005, Mr. Rattray moved to the second shift leadman position, reporting to Mr. Pincolic, who worked as welding foreman on first shift. After working on second shift for a period of time, Rattray was allowed to move back to first shift.

After Pincolic's promotion to welding foreman and Rattray's demotion in October 2005, Rattray trained Pincolic for the position of welding foreman in front of employees Rattray had previously supervised. Rattray did not want to train Pincolic for his former job, but felt he had no choice if he wanted to keep his job at Lippmann. Turner was unaware that Rattray was training Pincolic after the demotion.

Rattray trained Pincolic to do the time cards, inspection of welds, welding procedures, read weld symbols, use a weld gauge, estimate hours for repair jobs that come in, how to do the schedules, and how to do weld tests for new applicants. Rattray personally observed during the training that Pincolic, as welding foreman, did not know how to correctly use a welding gauge so Pincolic could not inspect the welds made by the employees he supervised. With regard to inspection of welds, it took several months for Rattray to train Pincolic because Pincolic had not gone to school for welding and did not have the welding

experience, so Rattray had to train him regarding all the different types of welding defects. All of the defects didn't show up at once, they showed up from time to time on different projects.

During this time period, Rattray was doing the inspection of welds, but Pincolic was taking the credit for it. With regard to welding procedures, it took weeks for Rattray to train Pincolic because there are certain jobs that were not done everyday at Lippmann. When those jobs came up, then Rattray trained Pincolic how to do a certain welding procedure. With regard to welding symbols, it took months for Rattray to train Pincolic because Pincolic had not gone to school for welding and he did not have the welding experience. With regard to estimating hours for repair jobs, it took months for Rattray to train Pincolic because different types of jobs with different types of damage came in from time to time.

After the demotion, Rattray asked for a desk to do his paperwork. Rattray ended up building his own desk after he claims he was told to do so. Pincolic used whatever desk was available to do his paperwork. Also after the demotion, certain employees pointed out to Rattray that he was "not in charge" and circumvented Rattray in order to ask a different employee questions that Rattray knew as a former welding foreman.

### IV.    Work environment

Throughout Rattray's employment, Rattray noticed racial slurs written in the company bathrooms, including "nigger," KKK and nazi swastikas. Rattray complained to Wagner about racial slurs in the bathroom. Lippmann refurbished the company bathrooms in 2007. Joseph Klismet, a welder in the production department for five years from 2002 to 2007,

-10-

observed racial slurs and images written in the company bathrooms and locker rooms. Klismet also personally observed that Wagner made a racist comment about Rattray, but not in the presence of Rattray. Another employee, Robert Riva, also observed the racist imagery in the company bathrooms at Lippmann.

In addition, someone placed a "dirty nigger" note on Rattray's locker in 2005. Rattray took down the "dirty nigger" note from his locker. Rattray did not know who wrote the "dirty nigger" note. Rattray didn't know who wrote the "dirty nigger" note or who continued writing the racial slurs and images in the bathroom stalls. Rattray posted a note on the notice board that said: "To whom it may concern: if you want to call me a nigger, call it to my face so I can know who you are."

Rattray brought the dirty nigger note to Wagner's attention. Wagner took the note and also removed the response note written by Rattray. Wagner told Rattray that he was more disappointed with Rattray than with the person who put the note on the locker. Wagner subsequently followed-up by asking a certain individual, Mike Bierle, if he wrote the note. Bierle, who is white, denied writing the note. Wagner informed Rattray of Bierle's denial. Mr. Rattray never had another note placed on his locker in the same manner during his employment at Lippmann like the "dirty nigger" note in 2005.

Mr. Rattray believes that he was degraded by Mr. Pincolic because he taught him everything he needed to know in welding "to the level that my employer thinks he was capable of replacing me." Mr. Rattray believes Mr. Pincolic was under qualified because he couldn't pass the weld test and because he never went to a welding institution. When Mr.

-11-

Turner promoted Mr. Rattray to welding foreman, he did not know that Rattray had a welding certification. When Mr. Turner promoted Mr. Pincolic to welding foreman, he did not review Mr. Pincolic's application. Rattray also believes that Pincolic was under qualified because he is a criminal and a known felon.

On December 21, 2006, Rattray had a meeting with Wagner and Gina Dathe from human resources regarding Pincolic's occurrences. When Rattray pointed out that Pincolic was being treated differently than Rattray regarding attendance issues, Dathe told Rattray to worry about his own problems, not other people's problems.

In November 2007, Rattray told Gerald Babineau, another leadman, that he had a problem with Babineau telling the welders not to come to Rattray for any help. Babineau said that he was Rattray's boss and that Rattray should go home if he didn't like that. Rattray explained to Babineau that he needed to work to finish his assignment. Babineau replied that Rattray could be killed and it could be made to look like an accident. Rattray told Wagner about this incident. Wagner followed up with Babineau, and Babineau denied making the statement.

In early December 2007, Pincolic asked Rattray to shorten the $CO_2$ process for a back weld. Rattray replied to Pincolic that if the $CO_2$ process was shortened, there would be two types of major weld defects, called "sand pockets" and "lack of fusion," which would weaken the strength of the weld. Pincolic told Rattray to follow his orders and shorted the $CO_2$ process for the back weld.

-12-

Rattray met with Wagner about what happened regarding the back weld. Rattray told Wagner that it felt like a set-up to make him look bad. Rattray told Wagner that he wanted written instructions so he could be protected from this happening again. At the same meeting, Rattray reminded Wagner about Babineau's death threat that happened in November 2007 and that nobody had done anything about it. Rattray then told Wagner that Pincolic had eliminated the stringer pass on the bar on the 5062 crusher. Wagner asked Pincolic why he eliminated the pass on the crushers. Pincolic said he did it to get the work done faster. Wagner allowed this procedure to be eliminated because he confirmed with another Lippmann foreman outside the welding department whose judgment he trusted that the elimination could be done. Rattray became frustrated and referred to Pincolic as "evil" and told him, "I know you don't believe in the God I believe in."

Wagner gave Rattray a Final Written Warning for his outburst towards Pincolic. Wagner wrote in the warning, "I expect you to cooperate and work together with Gerald [Babineau]." At the bottom of page 2 of the warning, Rattray wrote "Gerald say he will kill and let it look [like] a accident. I told Jeff Wagner. They do nothing about [it]." Wagner told Rattray that he was not going to make Pincolic write out assignments for him.

## V.   Termination

On January 7, 2008, Rattray was operating an overhead crane to move a piece of equipment, a 50 by 62 Pittman swing jaw, weighing approximately 40,000 lbs. At the time, Rattray was a leadman and had been trained in the safe operation of the use of overhead cranes and in fact had used overhead cranes throughout his tenure at Lippmann. Safety

-13-

officer Anthony Lorino observed Rattray performing the lift. Because of Rattray's incorrect operation of the crane, the material was being pulled to the side, or "side pulled" and dragged. As a result of the side pulling and Rattray's improper positioning, the wire rope "over wrapped" toward the center of the gear drum, causing it to be cut by the center drum gear. The swing jaw crashed to floor, causing damage to the concrete floor and the overhead crane. An investigation confirmed that this "near miss" was due to operator error. The repair estimate for the crane was $6,306.00 and the repair estimate for the floor was $7,350.00.

On January 17, 2008, Rattray's employment was terminated at Lippmann due to his unsafe operation of the crane and the magnitude of the crash. Rattray wrote on the disciplinary report that he did not operate the crane unsafely and that he did not know when the cable was cut.

## ANALYSIS

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

-14-

## I.    Demotion

Rattray concedes that he has no direct or circumstantial evidence that he was demoted from the welder foreman position on account of his race.  Therefore, Rattray attempts to proceed under the indirect method to survive summary judgment.  To establish a *prima facie* case for unlawful demotion, Rattray must show that (1) he is a member of a protected class, (2) he was performing his duties satisfactorily, (3) he was demoted (i.e., that he suffered an adverse employment action), and (4) Lippmann treated similarly situated employees outside of Rattray's class more favorably.  *See Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1998).

It is undisputed that Rattray was not meeting Lippmann's legitimate expectations for working as a welder foreman due to his attendance issues.  Rattray was a good welder and a productive employee, but this is not sufficient to defeat summary judgment.  Rattray's attendance issues caused significant disruptions because he was in charge of scheduling and coordination for all three shifts.  He could not perform those duties if he was absent.  Lippmann needed someone physically present at their facility on a regular basis to adequately fill the role of working welder foreman.

Rattray argues that his attendance issues were merely a pretext for discrimination.  *See Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) (noting overlap between factual inquiry relevant to "legitimate expectations" prong of the prima facie case and proof of pretext).  In order to show pretext, Rattray must show one of the following: "(1) defendant's explanation of plaintiff's [demotion] had no basis in fact, or

-15-

(2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the allegedly discriminatory action." *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001).

Rattray argues that the decision to demote him was pretextual because he was more qualified as a welder than Pincolic. Rattray's subjective belief in this regard is not relevant to the pretext inquiry. *See Johnson*, 260 F.3d at 733; *see also Farrell v. Butler University*, 421 F.3d 609, 615 (7th Cir. 2005) ("plaintiff's own opinion that her record supercedes that of the [candidate who was hired] is not enough in and of itself to establish pretext"). Even assuming that Rattray was objectively more qualified, Rattray fails to show that the difference in qualifications are "so favorable to the plaintiff that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002). Importantly, Rattray's evidence does not undermine Lippmann's position that Rattray was not qualified to continue working in the welding foreman position because of his attendance problems.[4] "It is well established that an employer is free to develop its own criteria in determining whom to promote, and [plaintiff] has failed to demonstrate that these were not [defendant's] true rationales." *Johnson* at 733.

The most salient undisputed fact is that Pincolic was the one who helped perform the foreman duties in Rattray's absence, leaving Lippmann with the impression that Pincolic could perform those duties on a full-time basis while Rattray could not. Even though

---

[4] Rattray also argues that the attendance policies were not enforced consistently because others with worse attendance problems were often promoted instead of demoted. None of those employees were promoted to the job of welding foreman, and none of those employees were subject to the unique job responsibilities of welding foreman.

-16-

Pincolic was not a perfect employee with perfect attendance, the evidence demonstrates that Rattray's demotion and Pincolic's promotion was based on the reasonable belief that Pincolic would be a better fit for the foreman position. Rattray's attendance issues in the context of the unique qualifications for the foreman position compels the conclusion that the decision to demote Rattray in favor of Pincolic was not pretextual. *See, e.g., Johnson* at 733 ("it is not our place to evaluate the wisdom of an employer's business decision"); *see also Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997) ("Plaintiffs lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless"). In sum, none of Rattray's evidence creates an issue of fact regarding pretext.

## II.    Hostile work environment

To establish a claim for hostile work environment under § 1981, Rattray must show that (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of employment; and (4) there is a basis for employer liability. *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004); *see also Dandy v. United Parcel Service*, 388 F.3d 263, 270 (7th Cir. 2004).

To determine whether harassment is "severe or pervasive," courts consider a variety of factors, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Adusumilli*, 164 F.3d

-17-

at 361. This test involves both a subjective and objective component. *See Wieland v. Department of Transp.- State of Indiana*, 98 F. Supp. 2d 1010, 1020 (N.D. Ind. 2000). The objective standard focuses on the environment's effect on a reasonable person; the subjective standard focuses on the environment's actual effect on the particular employee. *Id.* (citing *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1272 (7th Cir. 1991)).

The main focus of Rattray's harassment claim is the note stating "dirty nigger" that was placed on his locker at work. This racial epithet is unambiguously serious and offensive. *See Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)). However, this particular phrase was directed at Rattray only once during the entire five-year period of his employment at Lippmann. *See Dandy*, 388 F.3d at 271 ("in determining whether remarks 'objectively' create a hostile work environment we must assess the frequency of their use"); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (use of the epithet "nigger" on one occasion by a Caucasian co-worker insufficient to demonstrate severe or pervasive action creating a hostile work environment). Aside from infrequency, the anonymity of the note distinguishes this case from those in which the plaintiff's *supervisor* referred to the plaintiff with a racial slur. *Compare Rodgers*, 12 F.3d at 673 (finding an actionable hostile work environment when supervisors and employees referred to an employee by the term "nigger" between five and ten times while he was employed); *Peters*, 307 F.3d at 552 n. 14 (no actionable hostile work environment where comment made only once by a co-worker as opposed to a supervisor).

Finally, Lippmann immediately took corrective action when Rattray reported the incident, and the incident never repeated itself. Therefore, there is no basis for employer liability. *See Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 954 ("Our cases recognize prompt investigation of the alleged misconduct as a hallmark of reasonable corrective action"); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) ("To prevail on their § 1981 claims the plaintiffs must show not only severe or pervasive harassment but also 'a specific basis . . . for imputing the conduct that created the hostile environment to the employer'").

In addition to the racist note left on his locker, Rattray argues that racist imagery and graffiti in the company bathrooms, as well as various racist comments that were not made in his presence, made his work environment objectively hostile. This "second hand" harassment is insufficient to state an actionable claim. *See, e.g., Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) ("[T]he fact that a plaintiff merely heard through the grapevine that her supervisor once or twice referred to her in derogatory terms is not actionable sexual harassment"); *see also Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566-67 (7th Cir. 2004) (coworker's use of terms "motherfucking niggers" and "black motherfuckers" did not create actionable hostile work environment where the harassment was not directed at the plaintiff). There is no evidence to suggest that the graffiti in the bathroom was specifically directed at the plaintiff. *See Woodard v. Tower Auto Prods. Co.*, No. 00 C 50459, 2004 WL 2203394, at *2 (N.D. Ill. 2004) (incidents of racial graffiti, while disturbing and offensive, are not actionable when they are directed at a general audience rather than at the plaintiff); *compare*

-19-

*Cerros*, 288 F.3d at 1042, 1047 (evidence showed that the graffiti was directed at the plaintiff).

Finally, Rattray argues that the failure to give him keys or a work desk, being forced to train Pincolic after his demotion, and a death threat from a white co-worker contributed to a hostile work environment. Rattray provides no evidence that any of these occurrences were racially motivated. Moreover, aside from the death threat (for which Lippmann took corrective action), none of these incidents were severe or pervasive enough to be objectively hostile. *See, e.g., Twisdale v. Snow*, 325 F.3d 950, 953-54 (7th Cir. 2003) (prohibition against severe or pervasive harassment "does not protect the hypersensitive employee who is not deliberately targeted by the employer from the irritations endemic to the employment relation"). In sum, Rattray fails to create a genuine issue of fact on his claim for hostile work environment.

## III. Retaliation

Rattray attempts to proceed under the direct method of proof on his retaliation claim, wherein he must show (1) statutorily protected activity; (2) an adverse employment action taken by the employer; and (3) a causal connection between the two. *See Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). Rattray argues that his complaints about racial discrimination in the workplace to plant manager Jeff Wagner were protected activity. Rattray asserts that his demotion was the adverse employment action, but he has no direct evidence to show a causal connection between his complaints and his demotion. Rattray makes additional arguments which suggest that he is proceeding under the indirect, burden-

-20-

shifting method. For the reasons stated previously, Rattray did not meet his prima facie burden with respect to Lippmann's legitimate employment expectations, and Lippmann's justification for the demotion was not pretextual.

## IV. Spoliation of evidence

Finally, Rattray moves to compel the production of certain documents or, in the alternative, for a finding of spoliation of evidence. "An employer's destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the employer's case." *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002). To draw this inference, the employer must have acted in bad faith, *i.e.*, "for the purpose of hiding adverse information." *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001). "In borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)).

Rattray argues that Lippmann failed to produce the following documents: (1) the "dirty nigger" note; (2) written evaluations and reviews for Pincolic completed by Rattray; and (3) written evaluations and reviews for Rattray completed by Wagner. Lippmann avers that it has produced all relevant documents in its possession. Rattray fails to meet his burden of demonstrating that the failure to produce such documents was in bad faith.

-21-

Moreover, since most of the information requested was either readily available from other sources or irrelevant, it would be impossible to conclude that Lippmann destroyed these documents in an attempt to hide damaging information. *See, e.g., Park*, 297 F.3d at 615 ("crucial element" is "not that evidence was destroyed but rather the reason for the destruction"). Lippmann does not deny the existence of the "dirty nigger" note. The actual note itself is not necessary to proving Rattray's harassment claim. As for the performance reviews, the Court presumes for purposes of this motion that Rattray was a good welder and a productive worker, and also that Pincolic was not a perfect employee. This information was readily available from sources outside of the documentary evidence which Rattray claims was destroyed. This information was also insufficient to defeat Lippmann's motion for summary judgment.

-22-

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.  Lippmann's motion for summary judgment [D. 45] is **GRANTED**;

2.  Lippmann's motion to strike [D. 83] is **GRANTED**;

3.  Rattray's motion to compel or for a finding of spoliation of evidence [D. 53] is **DENIED**; and

4.  This matter is **DISMISSED**.

Dated at Milwaukee, Wisconsin, this 5th day of March, 2009.

**SO ORDERED,**

*s/ Rudolph T. Randa*
**HON. RUDOLPH T. RANDA**
**Chief Judge**